# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COTTON INTERNATIONAL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>WESTIN ST. JOHN HOTEL CO., INC., BAY VISTA OWNERS ASSOCIATION, INC., SUNSET BAY CONDOMINIUM ASSOCIATION, LLC, SUNSET BAY VACATION OWNERS ASSOCIATION, LLC, VISTANA SIGNATURE EXPERIENCES, INC., MARRIOTT VACATIONS WORLDWIDE CORPORATION, and WESTIN VACATION MANAGEMENT COMPANY,<br><br>Defendants. | Civ. No.:  1:21-cv-2099-JGK |

## COTTON INTERNATIONAL INC.'S RESPONSE
## TO MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

**Page**

BACKGROUND .................................................................................................................. 2

    I.    Cotton's Retention and the Contracts .................................................. 2

    II.    Marriott and Vistana Micromanage Performance and Reaffirm GRT Liability..... 4

    III.    Defendants' Refusal to Pay the GRT .................................................. 5

    IV.    Cotton's Lawsuit and the Apparent Conflict .......................................... 7

ARGUMENT ....................................................................................................................... 9

    I.    Cotton Plausibly Alleged That Marriott, Vistana, and Westin Management Manifested an Intent to be Bound to the Contracts and Therefore Can Be Held Liable as Non-Signatories. ................................................................ 9

        A.    Marriott and Vistana ............................................................. 11

        B.    Westin Management .............................................................. 20

    II.    WSJ's Partial Motion to Dismiss Should be Denied as Moot. ........................... 21

CONCLUSION.................................................................................................................... 22

8389316v1/016746

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alaska Electrical Pension Fund v. Bank of America Corp.*,
  306 F. Supp. 3d 610 (S.D.N.Y. 2018) ...................................................................17

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).....................................................................................9, 13

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
  778 F. Supp. 2d 375 (S.D.N.Y. Mar. 23, 2011)...................................................19

*Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*,
  361 N.E.2d 999 (N.Y. 1977)................................................................................10

*Buffalo Xerographix, Inc. v. Hartford Ins. Group*,
  No. 1:20-cv-520, 2021 WL 2003110 (S.D.N.Y. May 19, 2021)............................17

*Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal
  Servs. Fund & Annuity Fund v. Lollo*,
  35 F.3d 29 (2d Cir. 1994)...................................................................................18

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010)...............................................................................15

*Don v. Singer*,
  939 N.Y.S.2d 363 (N.Y. App. Div. 2012) .............................................................10

*eBC, Inc. v. Map Techs., LLC*,
  No. 09 Civ. 10357(CS), 2011 WL 12847702 (S.D.N.Y. May 17, 2011) ................18

*Endeavor Cap. Holdings Grp., LLC v. Umami Sustainable Seafood, Inc.*,
  No. 13 Civ. 4143 (NRB), 2014 WL 3897577 (S.D.N.Y. Aug. 7, 2014) .................21

*ESI, Inc. v. Coastal Corp.*,
  61 F. Supp. 2d 35 (S.D.N.Y. 1999) .....................................................................12

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
  375 F.3d 168 (2d Cir. 2004)................................................................................9

*Goldman v. Belden*,
  754 F.2d 1059 (2d Cir. 1985)..............................................................................9

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*,
   206 F. Supp. 3d 869 (S.D.N.Y. 2016) (Koeltl, J.) ..................................................9

*Horsehead Indus., Inc. v. Metallgelsellschaft AG*,
   657 N.Y.S.2d 632 (N.Y. App. Div. 1997) ........................................................9, 11

*Impulse Mktg. Grp., Inc. v. Nat'l Small Business Alliance, Inc.*,
   No. 05-CV-7776 (KMK), 2007 WL 1701813 (S.D.N.Y. June 12, 2007) ........................14, 17

*Jennings v. Hunt Cos., Inc.*,
   367 F. Supp. 3d 66 (S.D.N.Y. 2019) ...............................................................9, 12

*Keiler v. Harlequin Enters. Ltd.*,
   751 F.3d 64 (2d Cir. 2014)...........................................................................9

*Leutwyler v. Royal Hashemite Court of Jordan*,
   184 F. Supp. 2d 303 (S.D.N.Y. 2001) ..............................................................18

*MBIA Ins. Corp. v. Royal Bank of Canada*,
   706 F. Supp. 2d 380 (S.D.N.Y. 2009) ..............................................................10

*Mercator Corp. v. Windhorst*,
   159 F. Supp. 3d 463 (S.D.N.Y. 2016) ..............................................................17

*Personal Watercraft Prod. SARL v. Robinson*,
   No. 16-cv-9771 (AJN), 2017 WL 4329790 (S.D.N.Y. Sept. 1, 2017) ....................................19

*Powerbox (USA), Inc. v. Honeywell Int'l, Inc.*,
   No. 20 Civ. 3638 (VM), 2020 WL 6151491 (S.D.N.Y. Oct. 20, 2020) ....................11, 12, 19

*Recticel Foam Corp., Inc. v. Bay Indus., Inc.*,
   128 F. App'x 798 (2d Cir. 2005) ....................................................................10

*Roldan v. Second Dev. Servs., Inc.*,
   No. 16-cv-2364 (DLK)(PK), 2018 WL 1701938 (E.D.N.Y. Mar. 30, 2018)........10, 11, 13, 17

*RUS, Inc. v. Bay Indus., Inc.*,
   322 F. Supp. 2d 302 (S.D.N.Y. 2003) ..............................................................19

*RUS, Inc. v. Bay Indus., Inc.*,
   No. 01 Civ. 6133 (GEL), 2004 WL 1240578 (S.D.N.Y. May 25, 2004) ...............9, 12, 15, 19

*S. Coal Corp. v. Drummond Coal Sales, Inc.*,
   No. 1:17-cv-1104-AT, 2017 WL 7550765 (N.D. Ga. Nov. 15, 2017) ....................................19

*Shld, LLC v. Hall ("Shld I")*,
   No. 15 Civ. 6225 (LLS), 2016 WL 659109 (S.D.N.Y. Feb. 17, 2016) ....................12, 17, 18

iv

*Shld, LLC v. Hall ("Shld II")*,
    No. 15 Civ. 6225 (LLS), 2017 WL 1428864 (S.D.N.Y. Apr. 20, 2017) ..........................17, 18

*Silverberg v. SML Acquisition LLC*,
    No. 15-cv-7129 (CS), 2017 WL 758520 (S.D.N.Y. Feb. 17, 2017).................................13, 14

*TNS Holdings, Inc. v. MKI Secs. Corp.*,
    703 N.E.2d 749 (N.Y. 1998)................................................................................................11

*TransformaCon, Inc. v. Vista Equity Partners, Inc.*,
    No. 15-cv-3371 (SAS), 2015 WL 4461769 (S.D.N.Y. July 21, 2015)...................................12

*Wiederman v. Spark Energy, Inc.*,
    No. 19cv4564 (GBD) (DF), 2020 WL 3965258 (S.D.N.Y. Mar. 9, 2020)..............................11

*Winnett v. Bray*,
    No. 2:16-cv-00013-KGB-BD, 2016 WL 4744147 (E.D. Ark. Sept. 12, 2016)......................22

*Zurich Am. Life Ins. Co. v. Nagel*,
    No. 20-cv-11091 (JSR), 2021 WL 1877364 (S.D.N.Y. May 11, 2021)...................................7

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) .........................................................................9

Federal Rule of Civil Procedure 15 ...............................................................................22

The Marriott and Vistana entities with which Cotton dealt exclusively for nearly four years now seek an early exit from the ring, and to evade millions in liability, before the first round of pretrial discovery begins. Following two catastrophic hurricanes, Cotton agreed to restore Marriott's luxury resort on the island of St. John. The Contracts provided that Cotton was entitled to an amount equal to its cost to pay a gross receipts tax required under United States Virgin Islands law. But when Cotton requested reimbursement for that tax, Defendants refused and stuck Cotton with the bill.

From day one, Cotton dealt with Marriott and Vistana, and not with the Contracts' signatories. Marriott and Vistana first reached out to Cotton about restoring the Resort. The signatories did not. Marriott and Vistana approved, negotiated, and drafted the Contracts at issue. The signatories did not. Marriott and Vistana then served as Cotton's point of contact, overseeing and micromanaging the parties' performance under the Contracts. The signatories did not. As part of their oversight, Marriott and Vistana negotiated and executed change orders that modified the work Cotton would perform at the Resort and the amount it would get paid. The signatories did not. Only when Cotton requested and was wrongly denied reimbursement for its gross receipts tax obligations did Marriott and Vistana disappear. In their stead appeared Westin Management, a Marriott and Vistana affiliate, which sent Cotton a letter acknowledging *its* contractual "agreement" with Cotton and distinguishing liability under that "agreement" from that of the Contracts' signatories.

Despite their close, years-long involvement with Cotton and the Contracts, Marriott, Vistana, and Westin Management ask the Court to employ tunnel-vision and dismiss them from this case. They do so by purblindly claiming that the Court should consider only the Contract signatories—who cagily refuse to admit they executed the Contracts—and not what Marriott and

1

Vistana said to Cotton and did over the last four years. But New York law rejects such a myopic view and, at this stage, instead requires the Court to consider whether Cotton has pleaded sufficient facts plausibly to allege that Marriott, Vistana, and Westin Management manifested an intent to be bound to the Contracts. Cotton has.

Because Cotton has pleaded facts sufficient to meet its low burden to show that Marriott, Vistana, and Westin Management manifested an intent to be bound to the Contracts, the Court should deny the motion to dismiss and allow Cotton's claims against all Defendants to proceed to discovery.

## **BACKGROUND**

### I.  **Cotton's Retention and the Contracts**

Cotton is a sought-after provider of disaster recovery and logistical support services that performed restoration and reconstruction work at the Westin St. John Resort Villas (the "Resort") on the island of St. John in the United States Virgin Islands ("USVI"). ECF No. 56, at ¶¶ 7, 15, 20. In September 2017, two category-five hurricanes battered the tiny island with extreme winds, soaking rains, and relentless storm surge. *Id.* at ¶¶ 16–17. These back-to-back storms—two of the strongest to ever make landfall in the Caribbean—ravaged the Resort and temporarily forced it to close.  *Id.* at ¶ 19.

Days after the storms passed, Marriott Vacations Worldwide Corporation ("Marriott") and its corporate subsidiary Vistana Signature Experiences, Inc. ("Vistana") contacted Cotton about performing restoration and reconstruction work at the Resort to restore its villas, common areas, and other public buildings. *Id.* at ¶¶ 20–21. Cotton met with Marriott and Vistana on numerous occasions to discuss and negotiate the scope of Cotton's potential work at the Resort. *Id.* at ¶ 20. Once the three reached an agreement, Vistana's Vice President of Construction and Asset Management formally approved and signed off on retaining Cotton. *Id.*

2

Cotton's retention was memorialized in six separate, yet substantively identical, contracts (the "Contracts"). *Id.* at ¶ 22. Consistent with its close involvement all along, Vistana drafted and negotiated each of the Contracts. *Id.* Vistana executives signed the Contracts. *Id.*

The Contracts covered different areas at the Resort:

- One contract, Contract No. WSJ-17016 (the "Common Areas Contract"), covered certain shared and publicly accessible buildings. *Id.* at ¶ 23.

- A second contract, Contract No. WSJ-SB010 (the "Sunset Bay Developer Contract"), covered certain Resort buildings that were actively undergoing renovation when the hurricanes hit. *Id.*

- Four contracts,[1] all with the governing condominium owners' associations (the "COAs"),[2] covered various buildings at on-site villas and condominiums. *Id.* Although the COAs were listed as the signatories on these contracts, Cotton never met with, negotiated, or discussed them with the COAs; rather, it dealt with Vistana, Marriott, and Westin Management. *Id.* at ¶¶ 46, 52.

Each of the Contracts required payment to Cotton of a defined-term "Contract Sum" that

---

[1] These include Contract No. WSJ-BV012 (the "Bay Vista Contract"), Contract No. WSJ-CV011 (the "Coral Vista Contract"), Contract No. WSJ-SB015 (the "Sunset Bay Contract"), and Contract No. WSJ-VG014 (the "Virgin Grand Contract").

[2] The COAs are Bay Vista Owners Association ("Bay Vista"), Sunset Bay Condominium Association, LLC and Sunset Bay Vacation Owners, LLC (together, the "Sunset Bay Defendants"), Coral Vista Condominium Association, LLC, Coral Vista Vacation Owners Association, LLC, and Virgin Grand Villas – St. John Condominium Owners Association.

accounted for a Gross Receipts Tax ("GRT") required by USVI tax code. *Id.* at ¶ 23. And the Contracts did so in every which way possible. For instance, the Contracts' Scope of Work Exhibit identifies "Taxes, Gross Receipts" as included in the total "Contract Sum." *Id.* at ¶¶ 32–33. The Contracts further provide that Cotton "shall be reimbursed" for certain expenses "incurred with respect to the project[,]" such as all "Taxes and Permits." *Id.* at ¶¶ 34–35.

> **D.    TAXES AND PERMITS**
> The rates contained in this schedule are exclusive of federal, state and local sales, use, goods, services or excise taxes ("Taxes") and any applicable federal, state or local approval, consent, permit, license, contribution, duty and/or order fees ("Fees") incidental to the performance of the work. *Cotton International shall be reimbursed for all such Taxes and Fees incurred with respect to the project.*

Examples of reimbursable taxes include "use, goods, services or excise taxes," like the GRT. *Id.* And change orders that modified the Contracts list GRT liability, referred to as "Taxes, Gross Receipts", as part of the total amount due for Cotton's work. *Id.* at ¶¶ 40–43.

## II.  Marriott and Vistana Micromanage Performance and Reaffirm GRT Liability

As Cotton worked to restore the Resort, Vistana and Marriott were omnipresent. The two served as Cotton's "point of contact," actively overseeing and directing Cotton's work on the project. *Id.* at ¶¶ 46, 61. They did so in part by requesting, reviewing, negotiating, micromanaging, approving, and executing numerous change orders. *Id.* at ¶ 39. The COAs did not, and instead were under the "watch and control" of Marriott and Vistana. *Id.* at ¶ 61.

Each of the change orders was sent directly to Marriott or Vistana—indeed, Cotton prepared many change orders *at Vistana's request*. *Id.* at ¶ 39. And, contrary to Marriott's and Vistana's suggestion and strained rhetorical flourishes, ECF No. 73, at 13, the change orders *directly* affected the parties' performance: they specified the work Cotton would perform at the Resort, and they determined how much Cotton would be owed for that work. *See id.* at ¶ 40 (alleging that the change orders "modified the work and 'Contract Sum' due under the Contracts").

4

Marriott's and Vistana's close relationship with Cotton did not stop there. They instead acted to guarantee the amount owed to Cotton under the Contracts. Insurance covered much of the "Contract Sum" due to Cotton under the Contracts. *Id.* at ¶ 44. On occasion, the insurer did not promptly tender payment when it became due.[3] *Id.* Vistana and Marriott promised to cover the amount owed to Cotton, including the GRT. *Id.* Indeed, Marriott paid in excess of ten million dollars to Cotton under the Contracts. *Id.*

Marriott and Vistana repeatedly reaffirmed Cotton's contractual right to reimbursement in an amount equal to Cotton's cost to pay the GRT. At a June 2019 in-person meeting, for example, Cotton, Vistana, and an insurer met to discuss Cotton's restoration and reconstruction work at the Resort. *Id.* at ¶ 41. During that meeting, Vistana confirmed it owed Cotton for the GRT liability. *Id.* Marriott and Vistana likewise negotiated and executed three sets of change orders—*sixteen* change orders in total—each of which confirmed Cotton's contractual right to GRT reimbursement as part of the "Contract Sum." *Id.* at ¶¶ 40–43.

### III. Defendants' Refusal to Pay the GRT

Once Cotton began restoration work, it sent monthly payment applications for the previous month's work. *Id.* at ¶ 37. Cotton's applications included amounts due for the GRT liability. *Id.* But as Cotton's work at the Resort progressed, the USVI authorities had not yet determined how, whether, and to what extent the USVI taxing authority should or would impose GRT liability for exigent hurricane relief efforts. *Id.* Rather than demand advancement for a tax that might never

---

[3] Marriott and Vistana misread Cotton's allegations: Cotton does not allege that Marriott advanced a single interim payment "on *one* occasion." ECF No. 73, at 13 (emphasis in original). The Complaint instead alleges that Marriott (and Vistana) did so "on occasion," not on "an" occasion.

come due, Cotton temporarily waited to see what the USVI decided. *Id.* Years later, the USVI tax authority finally concluded that hurricane-relief efforts were, in fact, taxable and required Cotton to remit the GRT. *Id.* at ¶¶ 48–49.

Before remitting payment for the GRT, Cotton requested—and fully expected payment for—the temporarily withheld GRT payments owed to it under the Contracts. *Id.* at ¶ 50. Cotton never received those payments. Instead, it received two letters signed by Marriott's Senior Vice President and Treasurer trying to stick Cotton with the GRT bill. *Id.* at ¶ 52. (Neither letter even attempted to make the argument Marriott and Vistana's Motion advances now—that they were not bound by the Contracts under which Cotton had been performing for years.)

The first letter came from Westin St. John Hotel Co., Inc. ("WSJ") and purported to respond to GRT owed under the Common Areas Contract and the Sunset Bay Contract. *Id.* The second letter came from Westin Vacation Management Company ("Westin Management") as the "management company" for the COAs and purported to respond to the GRT owed under the Bay Vista Contract, the Coral Vista Contract, the Sunset Bay Developer Contract, and the Virgin Grand Contract. *Id.*; *see* ECF No. 74-1. In this letter, Westin Management referred to Cotton's contracts with the COAs as "our agreement," ECF No. 74-1, at 2, and argued that GRT was not covered by it. And for that reason only, Westin Management denied that it or the COAs were liable under the Contracts. *See id.* at ¶ 52 (distinguishing *Westin Management's* liability as separate from that of the COAs).

In their letters, WSJ and Westin Management claimed that the GRT was not their "responsibility" and refused to pay it. *Id.* at ¶ 53. As a result, and to avoid penalties and interest by taking advantage of a tax-amnesty period passed by the USVI legislature, Cotton fronted more than $5.2 million to cover the entire GRT liability. *Id.* at ¶¶ 53–56.

## IV. <u>Cotton's Lawsuit and the Apparent Conflict</u>

Defendants' refusal to honor the Contracts' GRT obligations prompted Cotton to file this lawsuit. Although pleaded as a single breach-of-contract claim, Cotton intends to seek damages from each defendant only under the Contracts that it either signed or to which it manifested an intent to be bound. Cotton expects to be reimbursed for its $5.2 million in GRT liability taxes it paid. Contrary to the Motion's repeated claim, Cotton has not pleaded that the Contracts' signatories (Bay Vista, the Sunset Bay Defendants, and WSJ) are jointly and severally liable for each other's tax liability.

Cotton's original Complaint named five separate defendants: Bay Vista, the Sunset Bay Defendants, WSJ, and Westin Management. The original Complaint alleged that WSJ, Bay Vista, and the Sunset Bay Defendants breached their respective contracts with Cotton by failing to pay Cotton an amount equal to the GRT owed by that defendant. Neither Bay Vista nor the Sunset Bay Defendants admit to being bound by *any* of the Contracts, nor do they admit that they even executed the contracts on which they are identified as signatories; rather, they simply state that documents "purporting to constitute and/or comprise contracts . . . related to Cotton were executed at certain times[.]" ECF No. 68, at 2; *see* ECF No. 69, at 6 (same). And that's it. As for Westin Management, Cotton alleged that it manifested an intent to be bound to the COAs' contracts, which Westin Management similarly breached for failing to reimburse Cotton for the GRT payments.

Despite Westin Management's outside-the-pleadings assertion that it "contracted with each individual Association to procure services from third-parties as needed for the Resort's maintenance[,]"[4] ECF No. 73, at 8, Bay Vista, the Sunset Bay Defendants, and Westin

---

[4] The FAC alleges no such thing, and the Court therefore should disregard this assertion. *See Zurich Am. Life Ins. Co. v. Nagel*, No. 20-cv-11091 (JSR), 2021 WL 1877364, at *1 (S.D.N.Y.

Management are each represented by separate counsel. The apparent reason for this separate representation is due to undisclosed conflicts "relating to each and all of the" COAs. ECF No. 38, at 2. These conflicts are purportedly "unusual and peculiar," *id.*, and make it "impossible" for common representation among the Defendants.  ECF No. 40, at 1. Whatever form these conflicts take, Cotton does not want its $5.2 million receivable to become a hot potato tossed from defendant to defendant. Denying the Motion would help prevent that result.

On July 2, 2021, Cotton filed its First Amended Complaint ("FAC").[5]  The FAC names the same five defendants as Cotton's original Complaint, plus Marriott and Vistana—the same two entities that Cotton dealt with for years. The FAC contains detailed and specific allegations to show that Marriott and Vistana "manifested an intent to be bound under the Contracts and therefore can be held liable as if they were signatories to the Contracts." ECF No. 56, at ¶ 61. Specifically, the FAC contends that Vistana and Marriott "drafted, negotiated, reviewed, approved, and ratified the Contracts and change orders[,]" promised to cover the amount due to Cotton under the Contracts, and paid more than ten million dollars to Cotton. *Id.* at ¶¶ 44, 61. The FAC further alleges that Westin Management manifested an intent to be bound by, among other things, micromanaging performance under the COAs' contracts and acknowledging that "it was the real party in interest[.]" *Id.* at ¶¶ 52, 62.

-----

May 11, 2021) ("On a motion to dismiss, the Court must generally consider only the allegations of the complaint . . . .").

[5] Marriott's, Vistana's, and Westin Management's bold claim that the Court "brushed aside Cotton's attempt to hold Westin Management . . . liable for breach,"  ECF No. 73, at 6, lacks any authority and is entirely detached from anything the Court said in its prior hearing.

**ARGUMENT**

When ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must assume that all allegations in the complaint are true and draw all reasonable inferences in Cotton's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Allegations need not be "detailed or elaborate," but merely "sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 68 (2d Cir. 2014). In reviewing these allegations, the Court's role is simply "to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Jennings v. Hunt Cos., Inc.*, 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir. 2004)); *see Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 206 F. Supp. 3d 869, 886 (S.D.N.Y. 2016) (Koeltl, J.) (stating that the Court is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient" (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985))). The Court may grant the motion to dismiss only if there are insufficient factual allegations, accepted as true, to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

I.  **Cotton Plausibly Alleged That Marriott, Vistana, and Westin Management Manifested an Intent to be Bound to the Contracts and Therefore Can Be Held Liable as Non-Signatories.**

Although a breach of contract action generally "may only be maintained against a party to the contract," a non-signatory can nonetheless "be held liable if its 'conduct manifests an intent to be bound by the contract.'" *Jennings*, 367 F. Supp. 3d at 71 (quoting *Horsehead Indus., Inc. v. Metallgesellschaft AG*, 657 N.Y.S.2d 632, 633 (N.Y. App. Div. 1997)); *see RUS, Inc. v. Bay Indus., Inc.*, No. 01 Civ. 6133 (GEL), 2004 WL 1240578, at *20 (S.D.N.Y. May 25, 2004) ("Even if a party does not sign the relevant written agreement, it will be bound if the totality of its

9

expressed words and deeds manifests an intent to be bound."), *aff'd sub nom. Recticel Foam Corp., Inc. v. Bay Indus., Inc.*, 128 F. App'x 798 (2d Cir. 2005). The non-signatory need not be a parent or "alter ego" of the contract signatory to be held liable. *MBIA Ins. Corp. v. Royal Bank of Canada*, 706 F. Supp. 2d 380, 397 (S.D.N.Y. 2009).

Whether a non-signatory has manifested an intent to be bound depends on "the totality of [a party's] expressed words and deeds[.]" *Roldan v. Second Dev. Servs., Inc.*, No. 16-cv-2364 (DLK)(PK), 2018 WL 1701938, at *8 (E.D.N.Y. Mar. 30, 2018) (quoting *MBIA*, 706 F. Supp. 2d at 397). In making this determination, courts consider factors such as whether the non-signatory "(1) participated in the negotiation of the contract; (2) micromanaged performance under the contract; (3) acknowledged it was the real party in interest; and (4) made payments on behalf of the signatory." *Id.* (citations omitted). This fact-bound issue is ill-suited for resolution on a motion to dismiss. *See Recticel*, 128 F. App'x at 799 ("The question of intent [to be bound] is a question of fact[.]"); *see also Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 361 N.E.2d 999, 1002 (N.Y. 1977) ("[W]here a finding of whether an intent to contract is dependent . . . on other evidence from which differing inferences may be drawn, a question of fact arises." (citations omitted)); *Don v. Singer*, 939 N.Y.S.2d 363, 363 (N.Y. App. Div. 2012) ("An issue of fact exists whether defendant Singer's conduct manifested an intention to be bound as a joint venturer with plaintiffs[.]").

Cotton need not carry a "heavy burden" to defeat Defendants' motion,[6] nor does it need to

---

[6] The case Defendants cite to wrongly ratchet up the burden Cotton must meet involve piercing the corporate veil, not whether the defendants manifested an intent to be bound. *See* ECF No. 73, at 15 (arguing that Cotton "carries a 'heavy burden'" to defeat the Motion (citing

establish each *Roldan* factor—a single factor is enough. *See Powerbox (USA), Inc. v. Honeywell Int'l, Inc.*, No. 20 Civ. 3638 (VM), 2020 WL 6151491, at *4 (S.D.N.Y. Oct. 20, 2020) (denying similar motion to dismiss where the plaintiff sufficiently alleged that the non-signatory "played an active role in the creation and negotiations of the contract").

A.   **Marriott and Vistana**

Each of the *Roldan* factors demonstrates that Cotton has pleaded facts sufficient to show that Marriott and Vistana manifested an intent to be bound under the Contracts. At a minimum, this factual dispute should be resolved not on a motion to dismiss, but rather by the factfinder at trial with the benefit of discovery.[7]

***Participating in the Negotiation of the Contracts***: Cotton has pleaded extensive particularized facts showing that Marriott and Vistana manifested an intent to be bound by participating in the negotiation of the Contracts. Participating in contract negotiations can take many forms, such as reaching out for a quote, sending a purchase order, and drafting or hammering out the details of the contract at issue. *See Powerbox*, 2020 WL 6151491, at *3 (finding that party manifested intent to be bound where representatives "reached out . . . for a quote", "sent the purchase order" and "emailed . . . to increase the units ordered"); *Horsehead*, 657 N.Y.S.2d at 633 ("[E]xtensive participation in the negotiations leading up to the" contract manifested an intent to

---

*Wiederman v. Spark Energy, Inc.*, No. 19cv4564 (GBD) (DF), 2020 WL 3965258, at *8 (S.D.N.Y. Mar. 9, 2020))); *see also TNS Holdings, Inc. v. MKI Secs. Corp.*, 703 N.E.2d 749, 751 (N.Y. 1998) ("Those seeking to pierce a corporate veil of course bear a heavy burden[.]").

[7] Marriott, Vistana, and Westin Management have each served thirty-eight document requests on Cotton, *see* Ex. 1 (Weiss Decl.), at ¶ 3, as the Court permitted in its June 15, 2021 Order, ECF No. 55.

be bound.). For instance, in *TransformaCon, Inc. v. Vista Equity Partners, Inc.*, the plaintiff sufficiently alleged that the non-signatory defendant manifested an intent to be bound by negotiating, reviewing, and approving the contracts.  No. 15-cv-3371 (SAS), 2015 WL 4461769, at *5 (S.D.N.Y. July 21, 2015) (footnotes omitted). And in *RUS, Inc.*, the non-signatory similarly manifested an intent to be bound where one of its employees "was the pointman and key decision-maker in the negotiations," while the signatory had no role at all.  2004 WL 1240578, at *21.

Cotton has sufficiently pleaded that Marriott and Vistana drove the contract drafting and negotiation process and thus manifested an intent to be bound to the Contracts. Cotton was contacted to perform restoration work at the Resort not by the Contracts' signatories, but rather by Marriott and Vistana directly. ECF No. 56, at ¶¶ 20, 61; *see Powerbox*, 2020 WL 615491, at *3 (reaching out for quote evinces intent to be bound). Marriott and Vistana leadership then attended multiple in-person meetings with Cotton to prepare for and discuss the project. ECF No. 56, at ¶ 20. Following these meetings, Vistana approved and signed off on the scope of Cotton's work at the Resort, and Vistana's contracts departments negotiated and drafted each of the Contracts. *Id.* at ¶¶ 20, 22.

Marriott's and Vistana's participation in and control over the Contracts' drafting and negotiation—actions taken without any involvement from the Contracts' signatories, some of whom deny (or at least refuse to admit)—that they are bound by the Contracts, plainly evinces an intent to be bound. *See Jennings*, 367 F. Supp. 3d at 72 (finding similar allegations "sufficient to allege that" the non-signatory "manifested an intent to be bound by the" contracts); *Shld, LLC v. Hall*, No. 15 Civ. 6225 (LLS), 2016 WL 659109, at *8 (S.D.N.Y. Feb. 17, 2016) ("*Shld I*") (inferring an intent to be bound from "participation in the negotiation of a contract"); *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 73–74 (S.D.N.Y. 1999) (same where the defendant "attended

12

meetings . . . and participated in the negotiations and drafting of" the contract). These allegations of specific meetings and actions are far from "vague and conclusory," as Marriott and Vistana claim. ECF No. 73, at 19.

***Making Payments on Behalf of the Signatories***: Cotton likewise alleges that Marriott and Vistana made payments on behalf of the Contracts' signatories. Cotton alleges both that Marriott and Vistana "promis[ed] to cover the amount due to Cotton" under the Contracts and that Marriott in fact "paid in excess of ten million dollars to Cotton under the Contracts." ECF No. 56, at ¶¶ 44, 61. This easily indicates an objective intent to be bound. *Roldan*, 2018 WL 1701938, at *8; *see Silverberg v. SML Acquisition LLC*, No. 15-cv-7129 (CS), 2017 WL 758520, at *6 (S.D.N.Y. Feb. 17, 2017) (assuming responsibility for payment manifests an intent to be bound).

Marriott and Vistana try to evade contractual liability by erroneously claiming that Cotton's allegation "that Marriott advanced *one* payment on behalf of WSJ's insurer . . . does not transform both Vistana and Marriott" into guarantors under the Contracts. ECF No. 73, at 21 (emphasis in original). That is both false and misses the point. It is false because Cotton does not allege that Marriott "advanced *one* payment"—it alleges that Marriott and Vistana did so "on occasion." ECF No. 56, at ¶ 44. And it misses the point because Cotton does not claim breach of a guarantee agreement. Rather, it simply points to Marriott's and Vistana's promise to cover the amount due under the Contracts as further evidence reflecting their intent to be bound.

More fundamentally, Marriott offers no response to Cotton's allegation that "Marriott paid in excess of ten million dollars to Cotton under the Contracts", *id.*—a fact that is true and which the Court must accept as true. *Twombly*, 550 U.S. at 555. Marriott and Vistana opt instead to distract from the real issue, claiming that Cotton should have known that the Contracts' signatories "were using an insurer to cover payments to Cotton." ECF No. 73, at 21. But Marriott and Vistana

cite no authority and offer no explanation for why the existence of insurance coverage alone proves that they did not manifest an intent to be bound under the Contracts as a matter of law. That insurance ultimately covered some of the payments does not neutralize Cotton's allegation in the FAC that Marriott and Vistana promised to cover—and, in the case of Marriott, actually covered—amounts due under the Contracts.[8] ECF No. 56, at ¶¶ 44, 61.  Discovery will reveal precisely which defendant's insurance policy covered the Resort's damages, but Marriott's and Vistana's lawyerly precision in describing that policy suggests it knows the answer, and it isn't favorable to their Motion to Dismiss. *See* ECF No. 73, at 21 (alleging that Cotton "knew the Owners were using *an* insurer" (emphasis added)).

***Micromanaging Performance***: Cotton has also alleged facts sufficient to show that Marriott and Vistana manifested an intent to be bound by micromanaging performance under the Contracts. Micromanaging performance can take many forms; it can range from tendering payment, *Impulse Mktg. Grp., Inc. v. Nat'l Small Business Alliance, Inc.*, No. 05-CV-7776 (KMK), 2007 WL 1701813, at *6 (S.D.N.Y. June 12, 2007), to discussing amendments or possible resolutions to contractual disputes, *Silverberg*, 2017 WL 758520, at *6, and more.

Marriott and Vistana unquestionably micromanaged performance under the Contracts in

---

[8] Marriott and Vistana also make the perplexing suggestion that Cotton's Complaint is designed to mislead the Court to thinking "that the payment came out of Marriott and Vistana's own pocket." ECF No. 73, at 13 n.9. But that's *exactly* what happened; the referenced payments were wired directly from Marriott's bank accounts. ECF No. 56, at ¶ 44. Whether Marriott was ultimately reimbursed for those payments cannot and does not change that Marriott made payments under the Contracts and thus manifested an intent to be bound.

myriad ways. Both Marriott and Vistana "served as Cotton's point of contact for its restoration and reconstruction work at the Resort." ECF No. 56, at ¶ 46; *see RUS, Inc.*, 2004 WL 1240578, at *21 ("pointman" allegations sufficient to show intent to be bound). The contract signatories, including the COAs, did not. They were instead always "under the watch and control of Vistana and Marriott." ECF No. 56, at ¶ 61. Marriott and Vistana further micromanaged the negotiation of numerous change orders—some of which Vistana requested in the first instance—and subsequently executed the change orders. ECF No. 56, at ¶¶ 39, 41–42. And Marriott paid more than ten million dollars due to Cotton under the Contracts. *Id.* at ¶ 44. Marriott's and Vistana's constant contact, direction, and oversight of Cotton's work at the Resort, including the parties' contractual obligations under the Contracts and change orders, exhibited an intent to be bound.

Marriott and Vistana do not (and, on a motion to dismiss, cannot) dispute that they micromanaged performance by serving "as Cotton's point of contact" for its work at the Resort. *Id.* at ¶ 46. They instead challenge only Cotton's allegations relating to the change orders, claiming that "'micromanaging change order negotiations' does not equate with 'micromanaging *performance*' under the Contracts[.]" ECF No. 73, at 20 (emphasis in original) (citations omitted). That's obviously wrong. The change orders served no purpose other than to affect the parties' performance under the Contracts: they affected the work Cotton would perform under the Contracts, and they affected the amount Marriott, Vistana, Westin Management, and the Contracts' signatories would owe Cotton for that work.[9] *See, e.g.*, Ex. 2, at 2 (adding "Curb Repairs," "FF&E

---

[9] The change orders are properly before the Court because they are "incorporated by reference in" and "integral" to the FAC. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see* ECF No. 56, at ¶¶ 39–44.

Repairs," and increasing the amount due under the Contracts); Ex. 3, at 2 (adding work for "Pipe Break," "Electrical," "HVAC Grilles," "Cruz Bay Finishes," "Awnings," "Structural Reinforcement," "Datacom Wiring," and "Dredging," and increasing the amount due under the Contracts); *see also* ECF No. 56, at ¶ 40 (alleging that the change orders "modified the work and 'Contract Sum' due under the Contracts"). Micromanaging the change orders is no different than micromanaging performance.

Marriott and Vistana confuse the law even further by implying the only way Cotton could have adequately pleaded that they micromanaged performance under the Contracts is by alleging that they "reviewed or approved payment applications, requests for work, services or other directions submitted by Cotton, or that Westin management, Vistana, or Marriott observed evaluated, administered, monitored or directed the work." ECF No. 73, at 21. Marriott and Vistana of course cite no authority for the proposition that micromanaging performance must take a specific form to manifest an intent to be bound. That's because there is none. In any event, Cotton pleaded the exact facts Marriott and Vistana claims are missing from the FAC; it alleges that Marriott and Vistana "served as Cotton's point of contact" and that the Contracts' signatories were under Marriott and Vistana's "watch and control." ECF No. 56, at ¶¶ 46, 61.

*Acknowledging Real Party in Interest*: And finally, Cotton has adequately pleaded that Marriott and Vistana acknowledged they were the real parties in interest under the Contracts. The FAC alleges that Vistana and Marriott promised to cover amounts due to Cotton under the Contracts, and that Marriott followed through with that promise to the tune of $10 million. ECF No. 56, at ¶ 44. It also alleges that Vistana conceded its own direct obligation to reimburse Cotton for the GRT due under the Contracts. *Id.* at ¶ 41. Such actions demonstrate that Vistana and Marriott manifested an intent to be bound by acknowledging that they were the real parties in

interest under the Contracts. *See Impulse*, 2007 WL 1701813, at *5–6 (alleging "direct payments to Plaintiff" from non-signatory suggests that it "was the actual party in interest or acknowledged that" non-signatory "had assumed obligations under the Contract or both").

Again, Cotton need only plead allegations proving a single *Roldan* factor to defeat Marriott's and Vistana's motion to dismiss. Cotton has pleaded facts establishing all four.

Marriott and Vistana nevertheless ask the Court to blind itself to these allegations, ignore their years-long involvement with Cotton, and dismiss them from this case entirely. No case cited by Defendants supports such a radical result. For example, In *Alaska Electrical Pension Fund v. Bank of America Corp.*, the plaintiff made "no allegations whatsoever to establish" that the non-signatory manifested an intent to be bound. 306 F. Supp. 3d 610, 624–25 (S.D.N.Y. 2018). The same was true in *Mercator Corp. v. Windhorst*, where the plaintiff offered the scant allegation that the non-signatory "assumed the role of a party to the Contract" without "reference to specific facts[.]" 159 F. Supp. 3d 463, 469 (S.D.N.Y. 2016). And in *Buffalo Xerographix, Inc. v. Hartford Insurance Group*, the plaintiff argued that "the *contracts*"—not the non-signatory's conduct— "manifest[ed] the intent . . . to be bound." No. 1:20-cv-520, 2021 WL 2003110, at *6 (S.D.N.Y. May 19, 2021) (emphasis added).

Similarly, Marriott and Vistana mistakenly contend that *Shld, LLC v. Hall* is "on all fours with this case[.]" ECF No. 73, at 21 (citing No. 15 Civ. 6225 (LLS), 2017 WL 1428864 (S.D.N.Y. Apr. 20, 2017) *("Shld II")*). The case is inapt. The plaintiffs in that case alleged that a collection of defendants, including the contract signatory, two non-signatory corporate defendants, and certain individuals that owned and controlled the non-signatory corporate defendants, breached a contract. The non-signatory corporate defendants moved to dismiss, arguing that they were not parties to the contract at issue. *Shld I*, 2016 WL 659109, at *7. The court *denied* that motion

17

because, like Marriott and Vistana here, the non-signatories displayed an intent to be bound by participating "in the negotiation of a contract." *Id.* at *7–8.

After the individual defendants defaulted, the plaintiffs argued that they, as agents who signed the contract, should be held personally liable. *Shld II*, 2017 WL 1428864, at *5. But the court declined to do so, as the plaintiffs had not presented the type of "clear and explicit" evidence required to hold an agent who signed a contract personally liable. *Id.* at *6 (quoting *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo*, 35 F.3d 29, 35 (2d Cir. 1994)). This case is like *Shld I* and not *Shld II*. Cotton does not seek to hold individuals who signed the Contracts personally liable.[10] Rather, as in *Shld I*, Cotton properly seeks to hold non-signatory entity defendants liable for breaching contracts they objectively intended to be bound to.

Even more puzzling, Marriott and Vistana cite a merger and integration clause contained in the Contracts as dispositive evidence that neither manifested an intent to be bound to the Contracts.  ECF No. 73, at 18. They are mistaken. To start, Defendants' conduct showing their intent to be bound "is inconsistent with the inferences" they ask the Court to draw "from [the] merger clause"— that they were not bound to the Contracts—and "a trier of fact 'may credit the[ir]

---

[10] Other cases cited by Marriott and Vistana are inapposite for this same reason. *See, e.g.*, *eBC, Inc. v. Map Techs., LLC*, No. 09 Civ. 10357(CS), 2011 WL 12847702, at *3, *7 (S.D.N.Y. May 17, 2011) (dismissing claim against individual members of signatory LLC who signed contract in representative capacities); *Leutwyler v. Royal Hashemite Court of Jordan*, 184 F. Supp. 2d 303, 309 (S.D.N.Y. 2001) (same where it was "inconceivable" for the plaintiff to think that individual defendants "were acting in their own capacity").

8389316v1/016746

conduct over the language of the agreement.'" *S. Coal Corp. v. Drummond Coal Sales, Inc.*, No. 1:17-cv-1104-AT, 2017 WL 7550765, at *9 (N.D. Ga. Nov. 15, 2017) (applying New York law) (quoting *Personal Watercraft Prod. SARL v. Robinson*, No. 16-cv-9771 (AJN), 2017 WL 4329790, at *7 (S.D.N.Y. Sept. 1, 2017)).

Indeed, courts have found that non-signatories manifested an intent to be bound and therefore could be held liable—including through conduct pre-dating the execution of the contracts at issue—despite the presence of merger and integration clauses. For instance, the contract at issue in *Honeywell* superseded "any prior or contemporaneous communications, representations, promises, or negotiations, whether oral or written" and stated that it did not "give rise to rights of any kind to any third parties." Exhibits Attached to Complaint at 14, 18, *Powerbox (USA), Inc. v. Honeywell Int'l, Inc.*, No. 20 Civ. 3638 (VM) (S.D.N.Y. May 11, 2020) (ECF No. 1-1). The court still held that non-parties manifested an intent to be bound by playing "an active role in the creation and negotiations of the contract." *Honeywell*, 2020 WL 6151491, at *4. And in *RUS, Inc.*, the non-signatory defendant similarly manifested an intent to be bound by serving as the "pointman and key decision-maker in the negotiations" despite the presence of a merger clause. *RUS, Inc.*, 2004 WL 1240578, at *21 (same); *see RUS, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 311 (S.D.N.Y. 2003) (noting that the contract "contain[ed] a merger clause").

Even if the factfinder ultimately gives the merger and integration clause full effect, that would merely limit Cotton to relying on post-execution evidence. *See BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 412 n.9 (S.D.N.Y. Mar. 23, 2011) ("[I]ntegration clauses only apply to preclude alleged agreements made prior to the signing of the contract containing the integration clause, not those made subsequent to the written contract." (citations omitted))). And Cotton has alleged *plenty* post-execution conduct manifesting an intent to be bound, including that

Marriott and Vistana micromanaged performance and made payments under the Contracts. *Supra* pp. 13–17. Either way, the Court cannot "conclude its analysis," ECF No. 73, at 18, by looking only to the merger and integration clause.

And as a practical matter, dismissing Marriott and Vistana at this early stage could impede Cotton from obtaining full relief. Bay Vista and the Sunset Bay Defendants have conspicuously refused to admit to being bound by *any* of the Contracts, much less that they executed them at all. ECF No. 68, at 2; ECF No. 69, at 6. If the Court accepts that apparent argument, dismissing Marriott and Vistana—the entities that Cotton dealt with for years—would threaten its ability to recover for the alleged contractual breaches.

As a result, the Court should decline to grant Marriott and Vistana—the precise entities Cotton has dealt with from the start—an early exit and instead should allow Cotton's claims to proceed to discovery.

### B.     Westin Management

Nor can Westin Management sidestep its obligations under the Contracts by claiming that it never intended to be bound.  After Cotton requested that the Contracts' signatories pay the GRT, Westin Management responded as the "management company" for the COAs. ECF No. 74-1, at 2. Westin Management's letter acknowledged that it was the real party in interest, referring to the Contracts with Cotton as "our agreement." *Id.* More telling, Westin Management specifically distinguished its liability under the Contracts from that of the COAs. *See id.* (claiming incorrectly that the GRT "is not the responsibility of the [COAs] or the undersigned"). Westin Management's letter, which acknowledged its "agreement" with Cotton under the Contracts and then distinguished its liability from that of the COAs, plainly displays an intent to be bound.

Faced with its own admissions, Westin Management now tries to backtrack. For instance, Westin Management claims that its role as the COAs' management company "dispels any notion

that Westin Management assumed payment obligations to Cotton." ECF No. 71, at 23. Yet Westin Management fails to explain why its "management company" status prevents it from being bound under the Contracts. Nor does it matter that the "subject line of the letter defines the [COAs] as 'Owners' and Cotton as 'Contractor.'" *Id.* Cotton does not claim that the Contracts identify Westin Management as a contract party, but rather that Westin Management's conduct reflects an objective intent to be bound. And Westin Management's letter acknowledging its "agreement" with Cotton while disclaiming liability for only the GRT portion is a far cry from either "terminating" the Contracts or disclaiming that it was ever bound in the first place. *Id.* at 24 (citing *Endeavor Cap. Holdings Grp., LLC v. Umami Sustainable Seafood, Inc.*, No. 13 Civ. 4143 (NRB), 2014 WL 3897577, at *4 (S.D.N.Y. Aug. 7, 2014)).

Westin Management's letter acknowledging its "agreement" with Cotton and distinguishing its liability under that "agreement" from that of the COAs reveals its intent to be bound.

## II.    WSJ's Partial Motion to Dismiss Should be Denied as Moot.

WSJ's out-of-left-field partial motion to dismiss should be denied as moot. WSJ initially answered Cotton's complaint. ECF No. 44. Cotton's FAC added not a single allegation pertaining to WSJ. WSJ nonetheless moved to dismiss "the FAC to the extent it seeks to hold WSJ liable for purported breaches of contracts other than those contracts that it entered into with Cotton." ECF No. 73, at 25. WSJ's motion is not worth the candle. Cotton concedes—and, indeed, would have stipulated had WSJ simply asked it to—that, at this stage, it is not arguing that WSJ manifested an intent to be bound under any Contracts that it is not a signatory to and will not seek damages under

21

those contracts.[11] Because there is no dispute and no relief to grant, the Court should deny WSJ's partial motion to dismiss as moot. *Cf. Winnett v. Bray*, No. 2:16-cv-00013-KGB-BD, 2016 WL 4744147, at *1 (E.D. Ark. Sept. 12, 2016) (denying motion to dismiss as moot where the claim targeted by the motion was not asserted in the complaint).

## **CONCLUSION**

For the foregoing reasons, this Court should deny Marriott's, Vistana's, and Westin Management's motion to dismiss, and deny WSJ's partial motion to dismiss as moot.

Dated: August 27, 2021                    Respectfully submitted,

By:   /s/ Ryan T. Weiss
SUSMAN GODFREY L.L.P.
Richard W. Hess
Ryan T. Weiss
1000 Louisiana Street, Suite 5100
Houston, TX  77002
Phone:  (713) 651-9366
rhess@susmangodfrey.com
rweiss@susmangodfrey.com

Jacob W. Buchdahl
Shawn J. Rabin
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Phone:  (212) 336-8330
jbuchdahl@susmangodfrey.com
srabin@susmangodfrey.com

*Attorneys for Plaintiff*

---

[11] Cotton expressly reserves its rights under Federal Rule of Civil Procedure 15 and the Court's Individual Rules to either amend or seek leave to amend the FAC should discovery prove otherwise.

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Ryan T. Weiss, hereby certify that this opposition complies with the formatting requirements under Rule II.D of the Court's Individual Practices.  Further, the memorandum complies with the word count limitations under Rule II.D in that it contains 6,798 words, exclusive of the portions not subject to counting pursuant to Rule II.D.

/s/ Ryan T. Weiss
Ryan T.Weiss